1 F.3d 1246
 63 Fair Empl.Prac.Cas. 768
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Robert DAVIS; Jane Kennedy; Angela Wingate; Jan Sutter;
Mary Ann Wold; Susan Tibbon; and Anna Marie
Karsant, Plaintiffs-Appellants,
v.
The CITY AND COUNTY OF SAN FRANCISCO, a municipality; Art
Agnos, Mayor of San Francisco; the San Francisco Unified
School District, a municipal agency; the San Francisco
Board of Education, a municipal agency; Ramon C. Cortines;
Sodonia M. Wilson, Ph.D; Leland Y. Yee, Ph.D; Rosario
Anaya; Myra G. Kopf; Joanne Miller; Libby Denebeim; and
Does 1 through 20, inclusive, Defendants-Appellees.
 No. 91-16579.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 2, 1993.
Decided July 15, 1993.
 
 Before FLETCHER, REINHARDT and NOONAN, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Appellants, nonminority male and female teachers, challenged as discriminatory the employment practices of the San Francisco Unified School District ("SFUSD" or the "District") taken pursuant to a 1983 consent decree. They now appeal the district court's grant of summary judgment in favor of appellees. We affirm.
 
 FACTS AND PROCEDURAL HISTORY
 
 3
 This case has its roots in an earlier action to desegregate San Francisco's public schools. After several years of litigation, the district court in 1983 approved a consent decree entered into by the NAACP and SFUSD. In addition to prescribing other remedial measures, the decree required SFUSD to "continue to implement a staffing policy such as that contained in Policy No. 4111.1, the goal of which is 'to achieve a staff at each school site and District location that will reflect the student population of the District.' " (Excerpts of Record ("E.R.") at 325.)[1] The District subsequently adopted an affirmative action plan which incorporated that objective. The plan remains in effect.
 
 
 4
 Appellants, all current and former tenured and substitute teachers in the District, originally filed a related action in California Superior Court in January 1990, naming as defendants SFUSD, the City and County of San Francisco (the "City"), the mayor of San Francisco, the San Francisco Board of Education, and various District officials. The City removed the action to federal court, where appellants filed a first amended complaint and the suit was dismissed as to the City, the mayor, and the other individual defendants. Appellants' second amended complaint, filed in October 1990 and styled as a class action, contains six causes of action. The first five allege: 1) violation of article I, section 8 of the California Constitution; 2) violation of 42 U.S.C. Sec. 1981; 3) violation of the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. Sec. 1983; 4) violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq.; 5) violation of Cal.Gov't Code Sec. 11135. The last requests declaratory relief invalidating the affirmative action plan. The district court denied appellants' motion for class certification.
 
 
 5
 Although their individual stories of alleged discrimination, recounted below, vary, appellants, all of whom are white, all point to the affirmative action plan as the source of employment problems they have encountered at SFUSD. They claim that they have been denied longer-term and permanent positions as teachers in the District and have been subjected to discriminatory working conditions as a result of SFUSD's adherence to what they consider to be an unlawful staffing policy.
 
 
 6
 After conducting discovery, appellants and SFUSD cross-moved for summary judgment. In opposing the District's motion and in support of their own, appellants relied primarily on their responses to two sets of interrogatories, the consent decree and affirmative action plan, and various unsubstantiated statistical reports concerning the labor market for teachers. They did not file any declarations detailing the alleged acts of discrimination and submitted only a single page of the one deposition they took prior to the close of discovery.
 
 
 7
 In support of its motion, SFUSD submitted a declaration by Roderick Hong, the District's director of personnel, summarizing the employment background of each appellant and in some cases explaining why he or she had not (or had not sooner) been hired for a position--most often because of lack of appropriate credentials. Hong does not cite affirmative action as a factor in any of these employment histories. A second declaration by Hong explains how SFUSD's affirmative action program operates in practice.
 
 
 8
 The district court, finding that appellants had failed to produce any evidence connecting their alleged injuries to the affirmative action plan, granted summary judgment to the District and dismissed the entire action for lack of standing.[2] In doing so, the judge observed that "[p]laintiffs' failure to conduct any meaningful discovery into the injuries they have suffered and the relationship between those injuries and the challenged Decree and Plan has been their undoing." (E.R. at 384.) The court did not reach the additional grounds for summary judgment urged by the District, and it denied appellants' cross-motion as moot.
 
 
 9
 Appellants have timely appealed the district court's decision.
 
 DISCUSSION
 
 10
 We review de novo a district court's grant of summary judgment on the basis of standing. People for the Ethical Treatment of Animals v. Department of Health and Human Servs., 917 F.2d 15, 17 (1990). Fed.R.Civ.P. 56(c) mandates the entry of summary judgment if, after adequate time for discovery, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Lujan v. National Wildlife Fed'n, 497 U.S. 871, 884 (1990). As the Supreme Court has explained,
 
 
 11
 Celotex made clear that Rule 56 does not require the moving party to negate the elements of the nonmoving party's case; to the contrary, 'regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the District Court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied.
 
 
 12
 Lujan, 497 U.S. at 885. In Lujan, in which the respondent was attempting to establish its standing to challenge agency action under the Administrative Procedure Act, the Court emphasized the importance of a litigant's coming forth with specific facts in support of its right to sue when faced with a summary judgment motion:
 
 
 13
 In ruling upon a Rule 56 motion, 'a District Court must resolve any factual issues of controversy in favor of the non-moving party' only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from 'assuming' that general averments embrace the 'specific facts' needed to sustain the complaint.
 
 
 14
 Id. at 888.
 
 
 15
 Since Article III confers jurisdiction over only "cases and controversies," before a federal court can consider the merits of a legal claim, the person seeking to invoke jurisdiction must establish the requisite standing to sue. Whitmore v. Arkansas, 495 U.S. 149, 154 (1990). This threshold inquiry "in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." Warth v. Seldin, 422 U.S. 490, 500 (1975). In order to establish standing, a plaintiff must allege a " 'distinct and palpable,' " as opposed to " 'abstract' or 'conjectural' or 'hypothetical,' " injury. Allen v. Wright, 468 U.S. 737, 751 (1984) (quoting various cases). The requirement that the party seeking judicial review be among the injured "gives [the] litigant a direct stake in the controversy and prevents the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders." United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 687 (1973). In addition to its personal and concrete nature, a party seeking judicial review must be able to show that the alleged injury is " 'fairly' traceable to the challenged action," and that "relief from the injury [is] 'likely' to follow from a favorable decision." Allen, 468 U.S. at 751 (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 38, 41 (1976)).
 
 
 16
 In the district court, appellants relied heavily upon the Supreme Court's decision in Martin v. Wilks, 490 U.S. 755 (1989), which held that employees could challenge an employer's actions taken pursuant to a previously entered consent decree as racially discriminatory even if the employees were not parties to the litigation that resulted in the consent decree. Wilks was in large part overruled by section 108 of the Civil Rights Act of 1991, which prohibits such challenges if the would-be plaintiffs had a reasonable opportunity to object to the decree or their interests were adequately represented by another party. 42 U.S.C. Sec. 2000e-2(n); Estate of Reynolds v. Martin, 985 F.2d 470, 475 n. 2 (9th Cir.1993). Appellants have not addressed on appeal the impact of the amendment on this litigation. We assume only for the purposes of discussion that section 108 does not bar this action.
 
 
 17
 In any event, Wilks does not suggest that every employee has automatic standing to challenge an employer's hiring and promotion practices under a consent decree. Rather, the employee still must satisfy traditional standing criteria. A review of the claims made by the seven[3] teachers reveals, as the district court found, that none of the appellants has demonstrated injury to themselves resulting from the plan or even alleged facts to counter the District's showing that the employment problems he or she faced were not traceable to the plan.[4]
 
 A. Robert Davis
 
 18
 In his interrogatory responses, Robert Davis, who has been a permanent teacher with the District since 1985, claims he was first subjected to discrimination "sometime between June of 1980 when I was laid off for the second time and September of 1984 when I was re-employed." (E.R. at 91.) He further claims that the SFUSD "should have rehired me between 1980 and 1983 for positions I was qualified to teach, but instead hired or rehired persons who were either new to the SFUSD or had less seniority than I." (Id. at 188.) In response to an interrogatory requesting more detailed information regarding these claims, Davis responded that there was "nothing to add." (Id.)
 
 
 19
 Davis has failed to identify the jobs he allegedly sought, has produced nothing to show he applied for them, and has not named the less senior candidates who were selected to fill them. Even assuming the truth of his allegations, he does not explain how the affirmative action plan played a role in the employment decisions he challenges, other than that the SFUSD engaged in hiring and promoting "according to racial criteria." (Id. at 187.) Clearly, under the above principles, Davis' conclusory statements are insufficient to support his standing to challenge the affirmative action plan.
 
 B. Jane Kennedy
 
 20
 Jane Kennedy also has held a permanent position with the District since 1985. She claims that she should have been reinstated as an English-as-a-second-language (ESL) or English teacher at Galileo High School in 1979 or 1980, and that instead she was retained as a substitute. She does not explain how these alleged deprivations relate to the affirmative action plan or the consent decree, both of which postdate the actions in question.
 
 
 21
 Kennedy appears more concerned with events which transpired after she was hired for a permanent position at Galileo in 1985. She states that after being hired she taught ESL classes "with outstanding professional evaluations until September 1988 when I was told I no longer qualified to be an ESL teacher because I had declined to undergo the ultra vires, unpaid and exploitative bilingual department mandated designated process." (Id. at 108.) According to the declaration submitted by Roderick Hong, Kennedy has refused to complete ESL training and therefore does not meet the District's requirements to teach ESL. Kennedy seems to be contending that the ESL training requirement has been unlawfully imposed. She does not explain how her experiences relate to the affirmative action plan or race discrimination in the District's employment practices, however.
 
 C. Angela Wingate
 
 22
 Angela Wingate probably comes closest to meeting the requirements for standing, but she has failed to identify a specific job for which she applied and that was awarded to a less senior or less qualified minority teacher.
 
 
 23
 Wingate has been employed as a day-to-day and long-term substitute teacher with the District since 1985. She claims she has inquired regularly about openings for permanent positions with the District since the spring of 1986. Asked in an interrogatory to identify specific instances of unlawful discrimination by SFUSD, however, she merely responded that she "regard[s] each and every Social Studies appointment made since May, June of 1986 of persons of lesser seniority than I as unlawfully lost opportunities." (Id. at 142.)
 
 
 24
 Wingate does recount several experiences in which she was told or overheard remarks to the effect that it is more difficult for whites to obtain permanent positions with SFUSD. She claims, for example, that she was sent to a "sham" interview by a personnel official who remarked to Wingate how "difficult it was to appoint whites." (Id. at 237.) She claims that another official told her that the District's delay in responding to her application to teach summer school was due to the fact that there had been too few minority applicants and that the District would therefore be advertising again. Wingate further states, without offering any substantiation, that Roderick Hong, the director of personnel, is "[o]n record as admitting he does not send whites to interviews and actively seeks their disadvantage and injury by his behavior." (Id.)
 
 
 25
 Wingate also relates an experience in which a principal told her she could not be retained for the following year (presumably as a permanent teacher) because there would be "no chance of getting two whites in the same credentialed area appointed to [the] school." (Id. at 244.) Wingate does not state that she actually applied for this position, however, or who was eventually appointed to it. Wingate has pointed to no specific employment opportunity she applied for that was awarded to a minority with lesser credentials. We conclude she has failed to demonstrate a concrete injury traceable to the affirmative action plan. Judge Orrick's observation that plaintiffs' failure to conduct meaningful discovery has been their undoing seems especially relevant in Wingate's case.
 
 D. Jan Sutter
 
 26
 Jan Sutter, a computer teacher, was formerly employed by SFUSD as a day-to-day and long-term substitute. Following the 1988-89 school year, the principal of Sala Burton Academic High School declined to rehire him. In his interrogatory responses, Sutter states:
 
 
 27
 I was removed from my position as a classroom teacher at Burton High School out of racial prejudice and without just cause.
 
 
 28
 I was subjected to continual harassment, slander and libel by a minority administrator because I attempted to apply for a permanent position and because of my alleged ethnic, racial and national background. This harassment included willful lodging of false and malicious charges of racial slurs against the administrator herself, Fredna Bell Howell, in front of my students with my employer SFUSD.
 
 
 29
 (Id. at 119.) One such charge was that Sutter told a student to "[g]et your black ass out of here." (Id. at 121.) The District and Sutter agree that the stated reason he was not rehired as a long-term substitute after the end of the 1988-89 school year was because administrators at Burton concluded that he was unable to interact positively with minority students. Sutter and the District are at odds as to whether the reason was based on false charges.
 
 
 30
 At bottom, Sutter's discrimination claim is that his employment opportunities at SFUSD were unjustifiably curtailed as a result of what he considers to have been racially motivated and false charges against him. He has not shown how the racial harassment he allegedly suffered at the hands of Burton High School's principal is related to the affirmative action plan. Although he points to minorities who were hired to teach computer classes at Burton and claims they were less qualified than he, once again, no details have been offered (for example, the others' credentials and seniority versus his own) to substantiate the allegations.
 
 E. Mary Ann Wold
 
 31
 Mary Ann Wold was laid off from the permanent teaching position she held at SFUSD in 1979, then worked in a substitute capacity, and, after applying unsuccessfully for a position in 1984, was rehired as a permanent teacher in 1985. Since then, she has applied for no other position.
 
 
 32
 Wold asserts that while she was substitute teaching, others with less seniority were hired for permanent positions that she was qualified to teach, including some individuals who were designated as bilingual even though they were not in fact bilingual. Although she names a number of these individuals, she does not contend that any was hired to fill the position for which she applied in 1984. Nor does she give specific reasons why she should have been hired in lieu of any of them; she merely states in conclusory terms that their seniority was the same as or junior to hers, that some held credentials similar to hers and were hired for positions she "could have filled," and that others were hired to fill positions "for which I was not credentialed, but then as near as I can tell, neither were they." (Id. at 215.) Thus characterized, Wold's alleged injury lacks sufficient concreteness and specificity to withstand the standing analysis.
 
 F. Susan Tibbon
 
 33
 Susan Tibbon is an art instructor who has worked in a substitute capacity for SFUSD since 1973. She has applied unsuccessfully for various permanent and summer school positions over the years and claims she was first discriminated against when she was rejected for a summer school job in 1984. Although in her interrogatory responses she asserts that she has been sent on "sham" interviews that were "humiliating and embarrassing" and mentions a black teacher who allegedly harassed her during one such interview, she offers nothing to connect her failure to obtain a permanent position with the affirmative action plan. She does not even assert as a general matter that SFUSD has hired art teachers with less seniority or inferior credentials during the period she has sought permanent status.
 
 G. Anna Marie Karsant
 
 34
 Anna Marie Karsant was laid off by the District in 1979, worked as a substitute teacher, and was rehired for a permanent teaching position in 1989. Her interrogatory responses are vague and fail to explain her alleged injury. She states merely that she "wanted a job and didn't get one" and that she should have been rehired during the period when she was substitute teaching as other art teachers died, retired or quit. (Id. at 223.) Karsant also appears to be complaining about the ESL credentialing process, bilingual education, and what she characterizes as the District's policy of "skipping over minorities when layoffs come." (Id. at 226.) She does not tie any of these various complaints to her own employment experience.
 
 CONCLUSION
 
 35
 Because we hold that appellants lack standing to bring this action, we do not reach their additional contentions on appeal that they have made out a prima facie case of employment discrimination under Title VII and that they are entitled to have the affirmative action plan declared unlawful.
 
 
 36
 The district court's grant of summary judgment is AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 According to the introduction to SFUSD's affirmative action plan, the District's commitment to affirmative action dates back to 1975, when an "affirmative action goal" was adopted by the Board of Education as part of Policy No. 4111.1. (E.R. at 294.) Policy No. 4111.1 has been amended somewhat over the years
 
 
 [2]
 Although only SFUSD moved for summary judgment, in view of its determination that appellants lacked standing, the district court dismissed the action as to all defendants
 
 
 [3]
 The second amended complaint names nine plaintiffs. Two were dismissed from the action prior to the court's grant of summary judgment
 
 
 [4]
 In analyzing whether appellants have standing, as the district court did, we are mindful that the questions of whether appellants have presented triable claims of employment discrimination and whether they have standing to sue are closely related. "Insofar as [a] statute defines [a] duty, it characterizes the injury and, if not explicitly, implicitly describes those who are entitled to enforce it." Idaho Conservation League v. Mumma, 956 F.2d 1508, 1513 (9th Cir.1992)
 We further note that the Supreme Court's recent opinion in Northeastern Fla. Chapter of the Associated General Contractors v. City of Jacksonville, No. 91-1721, 1993 U.S. LEXIS 4025 (June 14, 1993), which came down after this case was argued and submitted, does not alter our standing analysis. In General Contractors, nonminority contractors alleged that they were unable to bid on contracts because of Jacksonville's minority set-aside program. Id. at * 6, * 23 (plaintiffs would have bid on the contracts "but for" the set-aside ordinance). The Court held that the contractors had standing to challenge the ordinance: "To establish standing ... a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." Id. at * 19 (emphasis added).
 By contrast, in the case before us, plaintiffs were not barred from applying for the jobs they allegedly sought. They were not "excluded from consideration" as a result of a facially "discriminatory" classification. Moreover, unlike in General Contractors, as is discussed below, none of the plaintiffs here has succeeded in establishing a connection between his or her failure to obtain a job and the District's affirmative action program. Instead, plaintiffs assert generalized difficulties in obtaining employment that cannot be traced to the affirmative action plan. Cf. id. at * 21 (distinguishing Warth v. Seldin, 422 U.S. 490 (1975) (holding no standing where plaintiffs failed to demonstrate that their inability to locate housing resulted from challenged zoning ordinance)).