Karl C. SCHURR, Plaintiff,

v.

RESORTS INTERNATIONAL HOTEL, INC., New Jersey State Casino Control Commission, Bradford Smith, Chairman, New Jersey State Casino Control Commission, Defendants.

No. CIV. A. 96–3159.

United States District Court,
D. New Jersey.

June 30, 1998.

Stephen G. Console, Joseph J. Ayella, Law Offices of Stephen G. Console, Haddon Heights, NJ, for Plaintiff, Karl C. Schurr.

John M. Donnelly, E. Allan Mack, Scott J. Mitnick, Levine, Staller, Sklar, Chan, Brodsky & Donnelly, P.A., Atlantic City, NJ, for Defendant, Resorts International Hotel, Inc.

Peter Verniero, Attorney General, Andrew R. Sapolnick, Deputy Attorney General, State of New Jersey, Trenton, NJ, for Defendants, New Jersey State Casino Control Commission and Bradford Smith, Chairman, New Jersey State Casino Control Commission.

## OPINION

ORLOFSKY, District Judge.

In this action, Plaintiff, Karl C. Schurr, challenges the constitutionality of New Jersey regulations which govern affirmative action in casino industry hiring. These regulations do not appear to have been challenged in any federal court before. Schurr also attacks the specific affirmative action policies which his employer instituted in order to comply with those regulations and which were applied to him. Schurr claims that the regulations are unconstitutional, and that his employer's policies, and their application to him, violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* For the reasons set forth below, I find that the connection between the injury Schurr claims to have sustained and the allegedly unconstitutional state regulations, N.J.A.C. 19:53–4.1 *et seq.*, is far too attenuated to confer standing upon Schurr to assert his constitutional claims. I also find that Resorts' affirmative action policies, as instituted and applied to Schurr, did not violate Schurr's rights under Title VII. Accordingly, I will grant Defendants' motions for summary judgment and

deny Schurr's cross-motion for summary judgment.

## I. Facts and Procedural History

### A. Schurr's Work History at Resorts

The following facts are not generally in dispute. Plaintiff, Karl C. Schurr ("Schurr"), is a resident of Oceanville, New Jersey, and is a white male. Complaint ¶¶ 1, 6 (dated July 8, 1996) (hereinafter Compl.); Joint Final Pretrial Order 3 (dated Oct. 3, 1997) (hereinafter Jt. Final). Beginning sometime in 1974, Schurr held a variety of full-time positions with Defendant, Resorts International Hotel, Inc. ("Resorts"), a New Jersey corporation with its principal place of business in Atlantic City, New Jersey, and previously with Resorts' predecessor, Chalfonte–Haddon Hall. Id.; Deposition of Karl C. Schurr 12–13 (dated May 29, 1997) (hereinafter Schurr Depo.). In 1978, Schurr took a position as a member of the lighting crew at one of Resorts' theaters. Id. Schurr continued working in lighting at Resorts until approximately June, 1986. At that point, he resigned his full-time position to go into the restaurant business. Thereafter, he worked only on occasion for Resorts. Id. at 16. Thus, after June, 1986, Schurr was a "casual" worker, in that he did not have a full-time position with Resorts, but worked as a member of the relevant union on an "as needed" basis. Id. at 16–18; Deposition of William Stevenson 10 (dated June 4, 1997) (hereinafter Stevenson Depo.); Jt. Final at 3.[1]

At some point in late 1993, Dave Maturi ("Maturi"), a full-time light and sound technician, was suspended by Resorts. See, e.g., Schurr Depo. at 22–23; Stevenson Depo. at 9. Schurr and Bill Stevenson, Resorts' Director of Show Operations and Stage Manager, see, e.g., Compl. at ¶ 19, both believed that if Maturi chose to arbitrate his grievance with Resorts prior to his termination, his position would not be available until after the arbitration was resolved. See Stevenson Depo. at 9–10; Schurr Depo. at 22–23, 32. After Maturi's suspension, Schurr began filling in for Maturi on a regular basis, although he remained a casual employee. See, e.g., Schurr Depo. at 23–24; Stevenson Depo. at 10, 85.

It is the circumstances surrounding how Maturi's full-time position and another position as an apprentice mechanic were filled by Resorts that forms the basis of Schurr's claims. Before I turn to those circumstances, however, I must describe the affirmative action efforts required by New Jersey law and under the regulations promulgated by Defendant, New Jersey State Casino Control Commission (the "Commission"), of which Defendant, Bradford Smith ("Smith"), is the chairman.

### B. Affirmative Action in Casino Hiring

As part of the Casino Control Act, N.J.S.A. 5:12–1 et seq. (the "Act"), N.J.S.A. 5:12–134 requires, in relevant part, that applicants for licenses under the Act:

> formulate for [C]ommission approval and abide by an affirmative-action program of equal opportunity whereby the applicant guarantees to provide equal employment opportunity to ... members of minority groups qualified for licensure in all employment categories ... in accordance with the [New Jersey Law Against Discrimination, N.J.S.A. 10:5–1 et seq.]

N.J.S.A. 5:12–134. The Act also gives the Commission the power to enforce section 134, including the power:

> to investigate and determine the percentage of population of minority groups in the State or in areas therefor from which the work force for the licensee is or may be drawn; [and]
>
> to establish and promulgate such percentages as guidelines in determining the adequacy of affirmative-action programs submitted for approval pursuant to the provisions of section 134 of [the Act]

N.J.S.A. 5:12–135(a–b).

Under this authority, the Commission has promulgated regulations concerning the

---

1. The relevant union was Local 917 of the International Alliance of Theatrical Stage Employees & Moving Picture Machine Operators of the United States and Canada (the "Union"). See,

e.g., Brief of Defendant, Bradford Smith, in Support of Motion for Summary Judgment (dated Aug. 21, 1997) (hereinafter Smith's Brief in Support), Exh. F (Letter at 4, Exhs. 8, 13, 15A).

equal employment opportunity and affirmative action obligations of various sectors of the casino industry, including the work force of casino licensees, contractors involved in the construction of casinos, and enterprises which provide goods and services within the casino industry. *See* N.J.A.C. 19:53–1.1(b); N.J.S.A. 5:12–12 (defining "casino service industry"); *see generally In re Repeal of N.J.A.C. 19:53*, 282 N.J. Super. 217, 220–21, 226–27, 659 A.2d 941 (App. Div. 1995) (discussing role of Commission in implementing N.J.S.A. 5:12–134 to –135, and breadth of affirmative action required under the Act).

At issue in this action are the regulations with respect to the work force of casino licensees, N.J.A.C. 19:53–4.1 to –4.6. Section 4.1 sets forth the requirement that casino licensees and applicants provide "equal employment opportunity to all prospective and actual employees at all levels of the operations work force." N.J.A.C. 19:53–4.1(a). Pursuant to this obligation, casino licensees and applicants must:

1. Post notices available to employees and applicants for employment of the equal employment opportunity obligations of the casino licensee or applicant;

2. Include a statement in all postings, advertisements or other solicitations for employment that it is an equal opportunity employer;

3. Post all employment openings for response by qualified in-house employees and, when appropriate, advertise such openings in newspapers of general circulation and other media which reach a cross-section of the population in the area from which the work force will be drawn;

4. Send to each labor union or representative of workers with which it has a collective bargaining agreement, a notice of the obligations of the casino licensee or applicant under the Act and this chapter;

5. Evaluate any criteria, tests, interview procedures and other requirements for employment, promotion or transfer of employees to assure that they are not discriminatory in their impact or that no less

discriminatory methods of evaluation or prediction of job performance are feasible;

6. Provide to the Commission, upon request, a description of all criteria, tests, interview procedures or other procedures used to determine whether to employ an applicant for employment or to transfer, upgrade or promote an existing employee.

N.J.A.C. 19:53–4.1(b). Casino licensees and applicants also must:

[i]n the event that any criteria, test, interview procedure or other employment procedure used by a casino licensee or applicant is shown to have a discriminatory impact, the casino licensee or applicant shall be required to demonstrate to the satisfaction of the Commission that no less discriminatory method of evaluation or prediction of job performance is feasible. In such case, the casino licensee or applicant shall justify the requirements imposed and shall demonstrate to the satisfaction of the Commission that any criteria, tests, interview procedures or other procedures used are truly predictive of job performance. The casino licensee or applicant shall discontinue the use of any criteria, tests, interview procedures or other employment procedures which have a discriminatory impact and which cannot be validated as truly predictive of job performance to the satisfaction of the Commission. In attempting to establish the validity of the criterion, test, interview procedure or other employment procedure, the casino licensee or applicant shall be guided by the rules of the New Jersey Division on Civil Rights and the U.S. Equal Employment Opportunity Commission.

N.J.A.C. 19:53–4.1(c).

Section 4.3 sets forth the affirmative action obligations of casino licensees and applicants. It provides:

(a) Each casino licensee and applicant shall be required to undertake affirmative measures to ensure that women, minorities [2] and persons with disabilities are re-

---

2. Minority is defined as a person who is:

1. African American, who is a person having origins in any of the black racial groups in Africa;

cruited and employed at all levels of the operations work force and treated during employment without regard to their gender, minority status or disability. Such affirmative efforts shall, without limitation, address all employment practices including:

1. Employment, promotion, demotion or transfer;

2. Recruitment, recruitment advertising or posting;

3. Layoff or termination;

4. Rates of pay and other forms of compensation or benefits;

5. Selection for training and upward mobility programs; and

6. Grievance procedures for, and disposition of, complaints related to equal employment opportunity and reasonable accommodation in employment.

(b) In furtherance of the obligations imposed pursuant to (a) above, each casino licensee and applicant shall:

1. Post or advertise all personnel transactions which result in a promotion, title change, reclassification or a new hire prior to the selection of a candidate;

2. Undertake efforts to improve the representation of:

i. Women and minorities in job titles within EEOC job categories in which the casino licensee is below the applicable employment goals established by N.J.A.C. 19:53–4.4; and

ii. Persons with disabilities in all EEOC job categories;

3. Undertake special recruitment and advancement efforts such as the use of search firms, advertisements in media oriented to women, minorities and persons with disabilities, and notices to organizations that serve the interests of women, minorities and persons with disabilities, to improve the representation of:

i. Women and minorities in positions with salaries equal to or greater than $35,000; and

ii. Persons with disabilities in positions in all salary ranges;

4. Maintain and submit statistics on the applicant flow and disposition of candidates for employment who are women, minorities or voluntarily self-identified persons with disabilities, including the number who are interviewed or referred, and provide documentation of postings, classified advertisements and other media used to seek such candidates;

5. Develop and implement upward mobility training programs, approved by the Commission, which are designed to increase the representation of:

i. Women and minorities in EEOC job categories, including subclasses of Officials and Managers, in which the casino licensee or applicant is below the applicable employment goal for the category; and

ii. Persons with disabilities in all EEOC job categories and subclasses; and

6. Improve the representation of:

i. Women and minorities in positions covered by collective bargaining agreements in which the casino licensee or applicant is below the applicable employment goal for the category by complying with the provisions of (c) below; and

ii. Persons with disabilities in all positions covered by collective bargaining agreements by requesting in writing that the union or workers representative refer qualified candidates for employment who have voluntarily identified themselves as persons with a disability.

(c) If a casino licensee or applicant is below the applicable employment goal for women or minorities established by

2. Hispanic, who is a person of Spanish or Portuguese culture, with origins in Mexico, South or Central America, or the Caribbean Island, regardless of race; or

3. Asian American, who is a person having origins in any of the original peoples of the Far East, Southeast Asia, Indian Subcontinent, Hawaii, or the Pacific Islands.
N.J.A.C. 19:53–1.2.

N.J.A.C. 19:53–4.4 for a position covered by a collective bargaining agreement, the casino licensee or applicant shall, without limitation:

> 1. Request in writing that the union or workers representative refer qualified female or minority candidates, as appropriate, for the position in question; and
> 2. If the union or workers representative is unable to refer an appropriate woman or minority candidate, the casino licensee or applicant shall advertise the position on the open market and document its efforts to hire a qualified female or minority candidate for the position. This documentation shall include, without limitation, statistics on applicant flow, details on referrals received, disposition of candidates interviewed, letters of request to the union or workers representative, and copies of postings and advertisements.

N.J.A.C. 19:53–4.3 (footnote added).

The employment goals referred to in section 4.3(b)(2)(i), section 4.3(b)(5)(i), section 4.3(b)(6)(i), and section 4.3(c) are set forth in section 4.4. That section provides:

> Unless otherwise specified in an approved [equal employment and business opportunity plan ("EEBOP"), as defined in N.J.A.C. 19:53–6] the women and minority employment goals for the operations work force of a casino licensee or applicant, by EEOC job category, shall be as follows:

| EEOC Job Category | Minority Goal (Percentage) | Female Goal (Percentage) |
| --- | --- | --- |
| Officials and Managers | 25 | 46 |
| Professionals | 25 | 46 |
| Technicians | 25 | 46 |
| Salesworkers | 25 | 46 |
| Office and Clerical | 25 | 46 |
| Craftpersons | 14 | 5 |
| Operatives | 25 | 30 |
| Laborers | 25 | 14 |
| Serviceworkers | 25 | 36 |

N.J.A.C. 19:53–4.4 (emphasis in original). The language "unless otherwise specified in an approved EEBOP" was specifically retained in section 4.4 in order to "allow casino licensees to request the approval of individual employment goals." 25 N.J. Reg. 4930(b).

Finally, the regulations also require casino licensees to file quarterly and annual reports regarding their affirmative action efforts. See N.J.A.C. 19:53–4.5 to –4.6. Of particular relevance, the quarterly report requires that "if the casino licensee is below the applicable women or minority employment goal established by [section 4.4] for a job category in which a position with salary of $35,000 or more is filled by someone other than a woman or minority, the casino licensee shall document its efforts to hire or promote a women or minority to the position." N.J.A.C. 19:53–4.5(c)(2). Similarly, "[e]ach casino licensee or applicant whose annual operations work force composition report does not demonstrate that the casino licensee or applicant achieved the applicable employment goals established by N.J.A.C. 19:53–4.4 for the period covered by the report shall be required to document its efforts to implement and comply with the operations work force section of its EEBOP." N.J.A.C. 19:53–4.6(d).

No language in the regulations regarding a casino's work force requires that a casino employ the percentage of women or minorities specified in section 4.4. Rather, as N.J.S.A. 5:12–135(b) provides, the percentages in section 4.4 are guidelines in "determining the adequacy of affirmative-action programs." N.J.S.A. 5:12–135(b). See, e.g., 22 N.J. Reg. 1273(a) (noting, in Commission's response to industry comments to proposed regulations, that quotas are not used to burden industry); Smith's Brief in Support, Exh. D at 20 (noting that Resorts sees EEBOP figures as representing long term goals, not quotas); Brief in Support of Defendant Resorts' Motion for Summary Judgment (dated Aug. 6, 1997) (hereinafter Resorts' Brief in Support), Exh. B at 1–2, 9 (noting how Commission evaluates efforts at compliance with affirmative action obligations). All that is required in order for a casino to be deemed to have complied with its affirmative action obligations is that a casino licensee or applicant make good faith efforts to achieve the goals set forth in section 4.4. See N.J.A.C. 19:53–6.8(f) (requiring that licensee establish good faith efforts to achieve section 4.4 goals, if licensee has failed to do so); 15 N.J. Reg. 433(a) ("[T]he rules set forth minimum employment goals which may be used as *standards for determining an applicant's or licensee's good faith efforts at compli-*

ance.") (emphasis added); 20 N.J. Reg. 640(a); *see, e.g., Division of Gaming Enforcement v. Atlantic City Showboat, Inc.,* 92 N.J.A.R.2d (CCC) 56 (Jan. 27, 1992) (discussing good faith efforts and sanction for failure to make such efforts); *cf.* 25 N.J. Reg. 3847(b) (noting potential unfairness in finding that a casino licensee failed to make good faith efforts merely because it failed to meet certain goals); 20 N.J. Reg. 2446(a) ("Generally, the proposed new rules [regarding contracts with women and minority business enterprises] provide that any casino licensee that achieves the specified statutory goal in an annual review period shall be entitled to a *prima facie* determination that it has made the good faith efforts required by the Act."). Finally, neither the relevant statutes, the regulations, nor the Commission requires, mandates, or encourages that race or gender be considered as a factor in the actual hiring decisions. *See, e.g.,* N.J.S.A. § 5:12–134 to – 135; N.J.A.C. § 19:53–4.1 *et seq.;* Deposition of Gustave R. Thomas 34–35, 56–58 (dated May 30, 1997) (hereinafter Thomas Depo.).

## C. Schurr's Applications to Resorts

### 1. The Light and Sound Technician Position

In early July, 1994, Maturi's employment arbitration was concluded and his position as a light and sound technician could be filled. *See, e.g., id.* at 16; Schurr Depo. at 35; Deposition of Robert A. Chambers 21 (dated Apr. 9, 1997). Because Resorts had not met its minority and female goals for the technician category in N.J.A.C. 19:53–4.4, *i.e.,* minorities and women were "underutilized" in the job category in which the light and sound technician positions falls, Resorts was required to comply with the requirements of N.J.A.C. 19:53–4.3(c). *See* N.J.A.C. 19:53–4.3(c); Smith's Brief in Support, Exh. F (Letter at 2). Thus, on July 1, 1994, pursuant to N.J.A.C. 19:53–4.3(c)(i), Resorts sent the Union a letter requesting that it "refer qualified minority and female applicant [sic]" for the light and sound technician position. *Id.,* Exh. F (Exh. 4); Deposition of Gwen Lewis 42–43 (dated May 30, 1997) (hereinafter Lewis Depo.); *see also* Smith's Brief in Support, Exh. F (Exh. 14). There were five applicants for the full-time light and sound

technician job. Stevenson, who was solely responsible for making this hiring decision, narrowed the applicants down to two, Schurr, a white male, and Ronald Boykin, a black male, both of whom were "casual" workers and members of the Union at the time the position became available. *See, e.g., id.,* Exh. F (Exh. 5); Chambers Depo. at 21. The parties dispute whether Schurr was actually interviewed for the light and sound technician position, although they do not dispute that Schurr was seriously considered for the position. *Compare* Stevenson Depo. at 17–18 *with* Schurr Depo. at 39–40.

For approximately thirteen years Boykin worked as a "roadie" with various touring entertainment productions. Among his responsibilities were handling and setting up equipment, designing and directing lighting, and periodic management duties. Starting in approximately May, 1985, Boykin began working as a "casual" employee in the entertainment departments of Resorts and other Atlantic City casinos. *See* Deposition of Ronald L. Boykin 6–7, 36, 39–40, 42–43 (dated June 4, 1997) (hereinafter Boykin Depo.); Smith's Brief in Support, Exh. F (Exh. 6).

In the opinions of Stevenson, and Robert Chambers, Stevenson's superior and the person overseeing day-to-day operation of the entertainment department, Boykin and Schurr were both qualified for the position. *See, e.g.,* Stevenson Depo. at 20, 28, 60; Chambers Depo. at 22, 24, 44–45, 47, 110–12; *see also* Smith's Brief in Support, Exh. F (Letter at 3). Furthermore, in the opinion of Stevenson, Schurr and Boykin were equally qualified in terms of the listed duties and responsibilities for the light and sound technician position. *See* Stevenson Depo. at 38–39, 47, 51, 60; *see also* Smith's Brief in Support, Exh. F (Exhs. 1, 14). Schurr claims that he was more qualified than Boykin, but not that Boykin was unqualified. *See* Schurr Depo. at 36–37. It may have been somewhat easier and more efficient for Stevenson to have hired Schurr over Boykin. This is because Schurr had already been trained in ways in which Boykin had not been trained. *See* Stevenson Depo. at 16, 29, 61. The training time which could have been saved by Stevenson was approximately

"eight hours over the course of a couple of days." *Id.* at 29.

Boykin was selected for the light and sound technician position over Schurr. *See, e.g., id.* at 20. Stevenson selected Boykin over Schurr because he mistakenly believed that, as between two qualified candidates, only one of which was a minority, the job had to go to the minority candidate. *Id.* Chambers, Stevenson's superior, shared this belief and was under the impression that Resorts had no choice but to hire a minority where one of two qualified applicants for a position was a minority and where Resorts was below state-mandated goals in the position's category. *See* Chambers Depo. at 24–25, 28, 29, 100. Both Stevenson and Chambers indicated this to Schurr. *See* Schurr Depo. at 32–36; Chambers Depo. at 25, 28. It is, however, neither Resorts', nor the Commission's policy that a qualified minority or female applicant be preferred over a qualified non-minority or male candidate. Lewis Depo. at 44–45, 91–92; Smith's Brief in Support, Exh. D at 18 (noting that "in the event that an underutilized protected class vacancy is to be filled by a non-female/minority, the [Equal Employment/Affirmative Action] Department must be satisfied that all good faith efforts have been made to comply with Resorts' affirmative action plan before authorizing continuation of the hiring process."); Thomas Depo. at 57–58; *see, e.g.,* Deposition of Jerry A. Lotz 23–26 (dated June 4, 1997) (hereinafter Lotz Depo).

Although Schurr was denied the full-time light and sound technician position in July, 1994, he continued to work as a "casual" employee at Resorts and several other Atlantic City casinos. *See* Schurr Depo. at 37, 48–49. Moreover, since January, 1996, Schurr has been employed as a full-time employee at the Marriot Seaview Resort. *Id.* at 64. On March 17, 1997, Boykin was laid off from his position as a full-time light and sound technician. *See* Boykin Depo. at 5.

## 2. The Apprentice Mechanic Position

Some time in mid-July, 1994, Schurr also applied for a position as an apprentice mechanic. *See* Smith's Brief in Support, Exh. F (Exh. 14). Resorts exceeded its goals for minorities and females for the category within which the apprentice mechanic position fell, *see* Lewis Depo. at 71, Smith's Brief in Support, Exh. D at 15, Exh. F (Exh. 12), and therefore, no affirmative recruitment efforts were required under N.J.S.A. 19:53–4.3(c).

Eighteen people applied for the apprentice mechanic position, including Schurr. Schurr was never interviewed for the position, despite Resorts' general policy that all qualified applicants for a job should be interviewed. *See, e.g.,* Schurr Depo. at 39–40; Lewis Depo. at 44–45. The tracking form on which applicants' names were listed indicates only that Schurr was a "no show" for an interview. *See* Smith's Brief in Support, Exh. F (Exh. 10); Lewis Depo. at 71.

Jerry Lotz and Mike McTiernan made the decision as to whom to hire for the apprentice mechanic position. *See* Lotz Depo. at 5. Rafael Torres, a Hispanic male, was selected from among the eighteen applicants because he "was the best interview" and because of his qualifications. *Id.* at 11, 22; Deposition of Rafael Torres 4 (n.d.) (hereinafter Torres Depo.). Torres' race was not considered a factor in the decision which resulted in his hiring. *See* Lotz Depo. at 13.

## D. Schurr's Charge of Discrimination and His Complaint

On or about January 25, 1995, Schurr filed a Charge of Discrimination with the New Jersey Division of Civil Rights and the Equal Employment Opportunity Commission (the "EEOC") alleging discrimination on the basis of race by Resorts. *See* Compl. at ¶ 13 & Exh. 1. On May 7, the EEOC issued Schurr a Notice of Right to Sue. *Id.* at ¶ 14 & Exh. 2; *see generally* 42 U.S.C. § 2000e–5(f)(1).

On July 8, 1996, Schurr filed this action alleging five separate causes of action. Count I alleges a claim under Title VII against Resorts. *See, e.g.,* Compl. at ¶ 40. Count II alleges a claim under 42 U.S.C. § 1981 against Resorts. *See, e.g., id.* at ¶ 46. Count III alleges a claim under the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1 *et seq.* (the "NJLAD"), against Resorts. *See, e.g., id.* at ¶ 54. Count IV alleges a claim that the Commission and Smith have violated the Fourteenth Amendment to the

U.S. Constitution. *See, e.g., id.* at ¶ 58. Finally, Count V alleges a claim under 42 U.S.C. § 1983 against the Commission and Smith. *See, e.g., id.* at ¶ 61.

On January 13, 1997, with the consent of the parties I entered an order dismissing with prejudice all of Schurr's claims against the Commission, and dismissing with prejudice Schurr's section 1983 claim for monetary damage against Smith. *See.* Consent Order 2 (dated Jan. 13, 1997). These motions followed.

The Court may exercise jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3–4), 1367(a), and 42 U.S.C. § 2000e–5(f)(3).

## II. Standard on Motion for Summary Judgment

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see, e.g., Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996); *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1219 n. 3 (3d Cir.1988), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989).

In deciding whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *See, e.g., Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995); *Hancock Indus. v. Schaeffer,* 811 F.2d 225, 231 (3d Cir.1987). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor).

In deciding whether triable issues of fact exist, Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). The rule does not increase or decrease a party's ultimate burden of proof on a claim. Rather, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Anderson,* 477 U.S. at 255–56, 106 S.Ct. 2505.

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided evidence to show that a question of material fact remains. Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented ... by depositions, answers to interrogatories, or further affidavits," *id.,* "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 ("by its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion ...; the requirement is that there be no *genuine* issue of *material* fact") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Lujan v. National Wildlife Fed.,* 497 U.S. 871, 888, 110 S.Ct. 3177,

111 L.Ed.2d 695 (1990) ("[t]he object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit"); *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992) ("to raise a genuine issue of material fact ... the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather must exceed the " 'mere scintilla' threshold"), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

## III. Discussion

### A. Claims Against Smith

Schurr asserts one claim against Smith for declaratory and injunctive relief, namely, that his Fourteenth Amendment rights were violated by the Commission's requirement that Resorts and other casino licensees implement affirmative action plans which contain certain goals for the employment of minorities and women. *See* Compl. at 56–62. While he alleges violations of both section 1983 and the Fourteenth Amendment, this is really just one constitutional claim. That is because section 1983 is merely the mechanism for the enforcement of Fourteenth Amendment rights. *See, e.g., Hafer v. Melo,* 502 U.S. 21, 28, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Dennis v. Higgins,* 498 U.S. 439, 444, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991); *Quern v. Jordan,* 440 U.S. 332, 354–55, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (Brennan, J., concurring).

Because Schurr alleges only one claim against Smith and does not allege a Title VII claim against Smith, *see, e.g.,* Compl. at ¶ 40, I need not address Smith's argument that, for procedural reasons, Schurr cannot assert a Title VII claim against him. *See* Smith's Brief in Support at 28–29. Indeed, even Smith and the Commission's Answer to Schurr's Complaint recognized that no Title VII claim was stated against Smith or the Commission. *See, e.g.,* Answer ¶¶ 41–44 (dated Nov. 4, 1996).

Also, I need not address Smith's argument that Schurr's section 1983 claim is barred by the two-year statute of limitations under New Jersey law. *See, e.g., General Motors v. City of Linden,* 143 N.J. 336, 350, 671 A.2d 560 ("The statute of limitations for personal injury claims based on negligence, including section 1983 claims, is two years.") (citing *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)), *cert. denied,* — U.S. —, 117 S.Ct. 66, 136 L.Ed.2d 27 (1996); *Harel v. Rutgers, The State Univ.,* 1998 WL 240250, *18 (D.N.J. Apr.24, 1998). This is because Smith's argument is based on the incorrect assertion that Schurr's Complaint was filed in September, 1996. *See* Smith's Brief in Support at 26. This is demonstrably untrue—the Complaint was filed on July 8, 1996.

■ However, in his reply brief in support of his motion for summary judgment, Smith does actually stumble upon an issue which I must address: whether Schurr has standing to assert his constitutional claim.[3] Because standing speaks to whether there is a "case or controversy" over which the Court may properly exercise subject matter jurisdiction, I must address it. *See Steel Co. v. Citizens for a Better Environment,* — U.S. —, —, 118 S.Ct. 1003, 1012–16, 140 L.Ed.2d 210 (1998) (holding that federal courts must first squarely address the question of subject matter jurisdiction and may not assume "hypothetical jurisdiction" for the

---

**3.** I say "stumble" because in his moving brief, Smith does not specifically argue that Schurr has no standing. Rather, Smith originally argued that he played no role in Resorts' hiring decision such that no supervisory liability could be imposed upon Smith under *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). *See, e.g.,* Smith's Brief in Support at 2, 16; *see also Chinchello v. Fenton,* 805 F.2d 126, 133 (3d Cir. 1986). Perspicaciously, Schurr interpreted this as a challenge to standing and responded by arguing at some length that he satisfied the requirements for standing. *See* Plaintiff's Memorandum of Law in Opposition to Smith's Motion for Summary Judgment 11–15 (dated Sept. 12, 1997) (hereinafter Schurr's Memorandum in Opposition to Smith's Motion); *cf. Suber v. Chrysler Corp.,* 104 F.3d 578, 583 (3d Cir. 1997) (party asserting jurisdiction must have opportunity to respond to jurisdictional challenge). Then, and only then, did Smith more directly argue that Schurr did not satisfy the standing requirements. *See* Smith's Reply Brief in Support of Motion for Summary Judgment 1–5 (dated Sept. 19, 1997) (hereinafter Smith's Reply Brief in Support).

purpose of deciding a case on the merits); *see, e.g., Bryant v. New Jersey Dep't of Transp.,* 987 F.Supp. 343, 347 (D.N.J.1998), *vacated in part on other grounds,* 1998 WL 133758 (D.N.J. Mar.18, 1998). I address standing with respect to "the specific ... constitutional claims that a party presents" and must "examin[e] ... a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication *of the particular claims asserted." International Primate Protection League v. Administrators of the Tulane Ed. Fund,* 500 U.S. 72, 77, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991) (emphasis in original) (quoting *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).

■ In order to maintain a suit in federal court, Article III of the Constitution requires, at a minimum, "injury-in-fact—an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical ... a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the conduct complained of ... and it must be likely, as opposed to merely speculative, that the injury that can be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations and quotations omitted). Fair traceability means "a causal relationship between the injury and the challenged conduct, by which we mean that the injury 'fairly can be traced to the challenged action of the defendant,' and has not resulted 'from the independent action of some third party.'" *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville,* 508 U.S. 656, 663, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (quoting *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).

In *Northeastern Florida,* the Supreme Court clarified the standing analysis in an equal protection challenge to an affirmative action program, in particular the "injury in fact" prong. There, the Supreme Court held that:

[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

508 U.S. at 666, 113 S.Ct. 2297.

Applying these standards, I find that Schurr does not have standing because: 1) the Commission has not erected a barrier which made it more difficult for Schurr to compete for jobs at Resorts, or which makes it more difficult for Schurr to compete for future jobs at other casinos; 2) the injury which Schurr alleges, the deprivation, on the basis of race, of job opportunities at Resorts and elsewhere, *see* Compl. at ¶ 57, cannot be fairly traced to the regulations promulgated by the Commission.

### 1. Has Schurr Been Injured in Fact by the Commission's Regulations?

■ The Commission's affirmative action regulations in general, N.J.A.C. 19:53–4.3 *et seq.,* and the minority and women employment goals in particular, N.J.A.C. 19:53–4.4, do not erect a barrier to Schurr's ability to compete fairly for the positions for which he applied. As I explain below, the Commission's regulations mandate that casino licensees reach out to women and minority applicants, not that they prefer women and minorities in actually making hiring decisions. Because Schurr applied, and was seriously considered, for the light and sound technician job, he was not injured by Resorts' failure to affirmatively reach out to him. Indeed, all of the undisputed facts show that: 1) Schurr did effectively compete for the light and sound technician, so much so that Stevenson narrowed down his choices to Schurr and Boykin when making the final hiring decision; and 2) Schurr continues to compete for casual work at Resorts and other casinos.

The language of the Commission's affirmative action regulations, including the employment goals, does not require, suggest, compel, or mandate that race should be, or must be a factor in making hiring decisions. Rather, the obvious thrust of the regulations is that, in order to improve the representation of women and minorities in the job categories set forth in N.J.A.C. 19:53–4.4, a casino licensee should broaden the pool of applicants, not that casino licensees should prefer minorities and women to non-minorities and men in making hiring decisions.

This conclusion as to the meaning of the regulations follows from even the most casual review of the Commission's regulations. In order to improve the representation of women and minorities in those job categories, casino licensees must: "post or advertise all personnel transactions," "undertake special recruitment and advancement efforts such as the use of search firms, advertisement in media oriented to women [and] minorities . . . and notices to organizations that serve the interests of women [and] minorities," and "develop and implement upward mobility training programs . . . which are designed to increase the representation of women and minorities" in job categories in which the casino licensee is below the goal. *See* N.J.A.C. 19:53–4.3(b). Finally, where a casino licensee is below the applicable employment goal for a particular job category, it must solicit women and minority candidates for a specific position from the relevant union or must "advertise the position on the open market and document its efforts to hire a qualified female or minority candidate for the position." *See* N.J.A.C. 19:53–4.3(c)(1–2). As a matter of law, no hiring preference appears on the face of or is implied by the language of the regulations.

In the light of my conclusion as to the meaning of the Commission's regulations, Schurr has not and cannot show that there is a genuine issue of material fact regarding his ability to compete for any job. Not only are the facts undisputed regarding Schurr's ability to compete with Boykin, he also admits that he "has worked at Resorts in the very recent past, and continues to be contacted by Resorts to see if he is interested in working various shifts." Schurr's Memorandum in Opposition to Smith's Motion at 14. In short, what the Commission's regulations require casino licensees to do—broaden the applicant pool by employing various outreach efforts—did not in fact injure Schurr *and* do not continue to injure him. *See, e.g., Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 210–11, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (holding that past injury does not alone establish a "real and immediate threat" of future injury sufficient to convey standing); *Cone Corp. v. Hillsborough County,* 5 F.3d 1397, 1398 (11th Cir.1993) (plaintiffs did not have standing insofar as they challenge aspect of affirmative action program which does not create inability to compete equally).

Schurr relies substantially on *Bras v. California Public Utilities Comm'n,* 59 F.3d 869 (9th Cir. 1995), *cert. denied,* 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 748 (1996), as support for the proposition that the Commission's women and minority hiring goals "have the practical effect of requiring" that casino licensees prefer women and minorities over men and non-minorities. *See id.* at 875. *Bras* is easily distinguishable from the case at hand. The regulations at issue in *Bras,* in the opinion of the Ninth Circuit panel, clearly authorized and encouraged the use of preferences. For example, in *Bras* a utility could be sanctioned for failure "to *make acceptable progress* in the hiring of minority business." *See, e.g., id.* at 872 (emphasis added). The regulations at issue in this case, however, do not require any particular level of achievement of section 4.4's goals in order to avoid a sanction. All a casino licensee must do is document its good faith efforts to achieve the applicable goals. *See* N.J.A.C. 19:53–4.5(c)(2); N.J.A.C. 19:53–4.6(d) (casino licensees who fail to achieve section 4.4 goals must "document its efforts to implement and comply with the operations work force section of its EEBOP"); N.J.A.C. 19:53–6.8(f). Plus, unlike the regulations at issue in *Bras,* the clear thrust of the regulations in this case is to expand the applicant pool, with the goals articulated in section 4.4 reflecting a measure of the licensee's efforts at doing so. *See* N.J.S.A. 5:12–135(b). As I have already held, the Commission's regulations specifically do not authorize or encourage the use of

preferences in hiring. Instead, they specifically provide for other, much more benign methods by which casino licensees may expand the applicant pool.

Finally, to the extent Schurr could have, but did not rely upon *Monterey Mechanical Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997), *rehearing en banc denied*, 138 F.3d 1270 (9th Cir. 1998), the holding in that case, like *Bras*, was predicated upon the assumption that set-asides were encouraged, if not required by the applicable state regulation. *Monterey*, 125 F.3d at 711. *But see Monterey*, 138 F.3d at 1280 (dissenting from denial of rehearing *en banc*, and asserting that original panel improperly reached out for issue of quotas and set-asides and that the statute at issue "had nothing to do with quotas or set-asides"). Also, in *Monterey*, the injury to the plaintiff's ability to compete was, unlike the non-existent injury to Schurr's ability to compete, tangible and measurable. *See id.* at 707–08. Finally, the compelling dissents from the denial of the petition for rehearing *en banc* of that case suggest that *Monterey* may not be much more than tenuous authority, at best. *See Monterey*, 138 F.3d at 1273–80.

### 2. Is Schurr's "Injury" Fairly Traceable to the Commission's Regulations?

The second reason why Schurr does not have standing is that there is only the most attenuated relationship between the Commission's regulations and the hiring decisions which allegedly injured or will injure Schurr. It should be noted first that Schurr attributes his injuries to the Commission's regulation of someone *other than him, i.e.,* Resorts and other casino license holders. In such a circumstance, "the causation element" of standing analysis, *inter alia,* "require[s] more exacting scrutiny." *Freedom Republicans, Inc. v. Federal Election Comm'n*, 13 F.3d 412, 416 (D.C. Cir. 1994).

Coming between the Commission's regulations and Schurr's injury is the fact that an individual casino licensee must devise and implement an affirmative action policy, and the policy must be explained to, and implemented by, those actually making hiring specific decisions. Thus, with respect to the decision not to hire Schurr for the light and sound technician job, Schurr's damage is fairly traceable only to Resorts' actions in implementing its affirmative action plan and Resorts' actions in administering the plan through its employees, Stevenson and Chambers. Schurr's damage is not, however, traceable as far back as the Commission's regulations. *See, e.g., Simon*, 426 U.S. at 41–43, 96 S.Ct. 1917 (holding that plaintiffs did not have standing to challenge Internal Revenue Service ruling as to how hospitals could treat services rendered to plaintiffs because hospitals' decision to render service to plaintiff could not be traced to IRS ruling); *Marshall v. Meadows*, 105 F.3d 904, 906 (4th Cir. 1997) (injury stemmed not from state law, but from independent actions of state political party); *Davis v. City, County of San Francisco*, 1 F.3d 1246, 1993 WL 268452, *6 n. 4 (9th Cir.1993) (plaintiffs had no standing because they were not barred from competing for jobs they wanted and could not establish a connection between failure to obtain job and challenged affirmative action policy), *cert. denied*, 510 U.S. 1012, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993).

As far as future jobs are concerned, Schurr has not presented any evidence which might remotely show that, as a result of some unspecified licensee's affirmative efforts to solicit job applications from women and minorities, he has been denied the ability to compete for such jobs. Such an "injury," which as I point out above is nonexistent, is not only not imminent, but is also speculative. Schurr has not asserted that he is going to be looking for any position for which a casino licensee must make efforts to recruit applications from women and minorities under N.J.A.C. 19:53–4.4. *See Adarand*, 515 U.S. at 211–12, 115 S.Ct. 2097 (plaintiff had standing to challenge affirmative action program where plaintiff "made an adequate showing that sometime in the relatively near future it will bid *on another government contract that offers financial incentives .... for hiring disadvantaged subcontractors*") (emphasis added); *see, e.g., Training Institute, Inc. v. City of Chicago*, 937 F. Supp. 743, 753 (N.D. Ill. 1996) (plaintiff failed to show, *inter alia,* that it would ever bid in the future *on a contract subject to affirmative*

*action program* ) (emphasis added); *Converse Constr. Co., Inc. v. Massachusetts Bay Transp. Auth.*, 899 F. Supp. 753, 759 (D. Mass. 1995) (denying preliminary injunction and expressing some doubt that plaintiff would have standing because it had not taken steps to submit bids for contracts).

Indeed, the undisputed facts in the record demonstrate unambiguously that Schurr works full time in another position and that, for the occasional shift at Resorts or other casinos, he "continues to be a casual, on-call employee" and that he "continues to be contacted by Resorts" for jobs, Schurr's Memorandum in Opposition to Smith's Motion at 14, clear evidence that Schurr *is* effectively competing for those jobs and that he is not, and will not in the future be, disadvantaged in competition with women and minorities who benefit by the outreach provisions of N.J.A.C. 19:53–4.3.

■ Thus, the possibility of future harm is too remote and speculative for Schurr to have standing to challenge the Commission's regulation, a regulation, as I have already explained, which does not even prevent

Schurr from fairly competing for jobs and which does not require or mandate that race be a factor in hiring decisions, *see* Part III. A.1, *supra.* The "links in the chain" between the Commission's regulations and Schurr's alleged injury are "far too weak for the chain as a whole to sustain" Schurr's standing. *Allen,* 468 U.S. at 759, 104 S.Ct. 3315.[4] Accordingly, I will grant Smith's motion for summary judgment and deny Schurr's motion for summary judgment on his section 1983 claim.[5]

## B. Claims Against Resorts
### 1. Title VII Claim

■ In deciding whether Schurr or Resorts is entitled to summary judgment on Schurr's Title VII claim, I must first decide exactly how Resorts' affirmative action plan is to be evaluated. Schurr argues in opposition to Resorts' motion that a constitutional standard of "strict scrutiny" should apply. *See* Schurr's Memorandum in Opposition to Resorts' Motion for Summary Judgment 6–10 (dated Aug. 21, 1997) (hereinafter Schurr's Memorandum in Opposition to Resort's Mo-

---

4. Schurr argues that Stevenson and Chambers' misunderstanding of the legal obligations imposed upon casino licensees are evidence that the Commission's regulations have the "practical effect" of requiring preferences. *See* Schurr's Memorandum in Opposition to Smith's Motion at 12–13. This is not sufficient to confer standing on Schurr to claim any declaratory and injunctive relief, the only relief Schurr demands of Smith. To do so, Schurr would have to adduce facts sufficient to avoid a motion for summary judgment on the issue of whether every other casino to which Schurr may apply for a job misunderstands the Commission's regulations in the same way that Stevenson and Chambers did, or that the Commission *authorizes* the use of racial or gender preferences in making hiring decision. *See Lujan,* 504 U.S. at 561–62, 112 S.Ct. 2130 (noting plaintiff's burden to establish standing at various stages of litigation); *City of Los Angeles v. Lyons,* 461 U.S. 95, 105–06, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Schurr has done neither. *See, e.g.,* Thomas Depo. at 34–35, 56–58.

5. As an alternative basis for dismissing Schurr's claim, Smith could, but does not, raise the issue of proximate cause. Although related, the proximate cause element under section 1983 and the causation prong of the standing analysis are distinct. *See, e.g.,* 15 James Wm. Moore, *et al., Moore's Federal Practice* § 101.41[3] (citing

*Smith v. Block,* 784 F.2d 993, 995 (9th Cir. 1986)). A section 1983 claim could fail because the challenged conduct or regulations may not be the proximate cause of any harm sustained by a plaintiff. *See, e.g., Springer v. Seaman,* 821 F.2d 871 (1st Cir. 1987); *Arnold v. International Business Machines Corp.,* 637 F.2d 1350 (9th Cir. 1981); *Angle v. Sabatine,* 1998 WL 54400, *6 (E.D.Pa. Jan. 27, 1998). A section 1983 challenge to a state regulation could also fail because the behavior of others, for example, those who implement and administer a policy promulgated pursuant to state law, is a superseding cause of a plaintiff's damage. *See, e.g., Warner v. Orange County Dep't of Probation,* 115 F.3d 1068, 1071 (2d Cir. 1996) ("in cases brought under section 1983 a superseding cause, as traditionally understood in common law tort doctrine, will relieve a defendant of liability"); *Springer,* 821 F.2d at 877. As I do not have jurisdiction to consider Schurr's constitutional claims, the Court has no power to announce, even as an alternative basis, a decision on the question of whether Schurr could satisfy the causation aspect of a section 1983 claim. *See Steel Co.,* —— U.S. at ——, 118 S.Ct. at 1012 ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.") (quoting *Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868))

tion). This argument is wholly without merit. Even if Resorts' plan is state-mandated, it is difficult to see why Resorts' plan should be evaluated under a standard more exacting than the standard which would be used to evaluate a governmental employer's affirmative action plan under Title VII. *See Johnson v. Transportation Agency,* 480 U.S. 616, 627–28, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987). Furthermore, to do so would be to do transform a Title VII analysis into a constitutional analysis, something which the Supreme Court has specifically foreclosed. *See id.* at 627 n. 6, 107 S.Ct. 1442; *Taxman v. Board of Ed. of the Township of Piscataway,* 91 F.3d 1547, 1560–62 (3d Cir. 1996) (*en banc* ), *cert. dismissed,* —— U.S. ——, 118 S.Ct. 595, 139 L.Ed.2d 431 (1997); *Taxman,* 91 F.3d at 1568 (Sloviter, C.J., dissenting). Indeed, in support of his motion for summary judgment, Schurr appears to abandon the argument that strict scrutiny should apply. *See* Schurr's Memorandum in Support at 8–18. Accordingly, Resorts' affirmative action plan, although required by state law, should be evaluated under the standards set forth in *United Steelworkers of Am. v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), the seminal affirmative action opinion involving private employers, as refined by *Johnson. See, e.g., Taxman,* 91 F.3d at 1559–60.

A Title VII claim is analyzed under the approach set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as refined by *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See, e.g., Johnson,* 480 U.S. at 626–27, 107 S.Ct. 1442; *Taxman,* 91 F.3d at 1556. To establish a prima facie case, a plaintiff must raise a rebuttable inference of discrimination by showing that: 1) he or she is a member of a protected class; 2) he or she has applied for and was qualified for a position, but was rejected despite those qualifications; and 3) the position remained open with the employer continuing to search for applicants with claimant qualifications. *McDonnell Douglas,* 411 U.S. at 800, 93 S.Ct. 1817. In *Johnson,* the Supreme Court set forth exactly how the shifting burdens of proof function:

Once a plaintiff establishes a prima facie case that race or sex has been taken into account in an employer's employment decision, the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision. The existence of an affirmative action plan provides such a rationale. If such a plan is articulated as the basis for the employer's decision, the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid. As a practical matter, of course, an employer will generally seek to avoid a charge of pretext by presenting evidence in support of its plan. That does not mean, however ... that reliance on an affirmative action plan is to be treated as an affirmative defense requiring the employer to carry the burden of proving the validity of the plan. The burden of proving its invalidity remains on the plaintiff.

*Johnson,* 480 U.S. at 626–27, 107 S.Ct. 1442; *see, e.g., Contractors Ass'n of Eastern Penn., Inc. v. City of Philadelphia,* 6 F.3d 990, 1005–06 (3d Cir. 1993).

### a. The Apprentice Mechanic Position

▮ With respect to the claim that Schurr was denied the apprentice mechanic position in violation of Title VII, Schurr has not established a prima facie case that the characteristic of a protected class has been used in an employment decision. At trial, Schurr would be required to do so by a preponderance of the evidence. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). On the summary judgment record before me, there is simply no evidence which suggests that race was a factor in Lotz's decision to hire Torres and in the failure to interview Schurr for the position, and no fact which could create a rebuttable presumption of employment discrimination under *McDonnell Douglas.*

First, the apprentice mechanic position was in a job category under section 4.4 which was not underutilized, such that Resorts' affirmative action obligation to "undertake to improve the representation of women and minorities," *see* N.J.A.C. 19:53–4.3(b)(2)(i), 19:53–4.3(b)(6)(i), 19:53–4.3(c), was not trig-

gered. *See Whalen v. Rubin,* 91 F.3d 1041, 1045–46 (7th Cir. 1996) (holding that plaintiff failed to establish link between employer's affirmative action policies and the actions towards him); *Cerrato v. San Francisco Community Coll.,* 26 F.3d 968, 973–74, 976 (9th Cir. 1994) (holding that because affirmative action plan was not used or applied in making hiring decision no racial discrimination claim could be alleged and holding that mere existence of affirmative action plan "is not relevant to proving discrimination unless the employer acted pursuant to the plan").

Second, there is no evidence in the summary judgment record to suggest that the reasons Jerry Lotz gave for hiring Rafael Torres, specifically his ability to perform the job and the quality of his interview, *see* Lotz Depo. at 11–12, 22–26, were not the actual reasons why Torres was offered the job. The fact that Lotz's decision to hire Torres was made near in time to Stevenson's decision to hire Boykin, *see* Schurr's Memorandum in Opposition to Resorts' Motion at 3–4, does not create a genuine issue of fact since there is no evidence in the record to suggest that Lotz's decision was influenced in any way by Stevenson's decision, or that Lotz even knew of Stevenson's decision.

Third, no evidence in the summary judgment record suggests that the reason why Schurr was not interviewed for the apprentice mechanic position had anything to do with race. That is to say, Schurr was not rejected "despite his qualifications." *McDonnell Douglas,* 411 U.S. at 800, 93 S.Ct. 1817. Rather, Schurr was not hired because he was not interviewed, either because

Schurr failed to appear for the scheduled interview, *see* Smith's Brief in Support, Exh. F (Exh. 10), or because Resorts failed to contact him to schedule the interview, Schurr Depo. at 39–40. However, taking the evidence in the light most favorable to Schurr, as I must on Resorts' motion for summary judgment, the mere facts that Schurr was not contacted to schedule an interview and that ultimately a non-white was hired for the position, half of the applicants for which were non-white, *see* Smith's Brief in Support, Exh. F (Exh. 10), does not establish a prima facie case of impermissible discrimination under Title VII. Accordingly, I will grant Resorts' motion for summary judgment and deny Schurr's motion for summary judgment on the claim with respect to the apprentice mechanic position.[6]

### b. The Light and Sound Technician Position

Unlike his claim with respect to the apprentice mechanic position, Schurr has established a prima facie case of a Title VII violation in connection with Resorts' failure to hire him for the light and sound technician position, as Resorts concedes. *See* Resorts' Brief in Support at 19. Nor do the parties appear to dispute that Resorts' decision not to hire Schurr for the light and sound technician position was the result of Resorts' affirmative action policy. *See* Schurr Memorandum in Opposition at 28. As in *Taxman,* the parties proceed swiftly in their papers to the question of whether Resorts' affirmative action policy is invalid. *See Taxman,* 91 F.3d at 1556.

---

**6.** Some courts have modified the first prong of the prima facie case in a "reverse discrimination" case, *i.e.,* the case where the employer is alleged to discriminate against the majority. *See, e.g., Harel,* 5 F.Supp.2d at 264. Although the Third Circuit has not addressed that issue, I need not decide whether such a modification is appropriate. This is because, even under the modified standard—which substitutes for plaintiff's burden to show that he is a member of a protected class the burden to show "background circumstances ... support[ing] the suspicion that the defendant is the unusual employer who discriminates against the majority," *id.* at 264 (quoting *Parker v. Baltimore & Ohio R.R. Co.,* 652 F.2d 1012, 1017 (D.C. Cir. 1981))—Schurr adduces no fact in opposition to the motion for summary

judgment that he was rejected *despite his qualifications.* Thus, Schurr cannot avoid summary judgment.

Even if Schurr were able to satisfy his obligation to establish a prima facie case, under either the normal or modified standard, Resorts has adequately shown a non-discriminatory reason why Schurr was not hired, the fact either that no interview was scheduled or that Schurr failed to appear for the interview. In such a circumstance, Schurr would be forced to show that this explanation is a pretext. Schurr does not adduce any such facts. Accordingly, summary judgment in Resort's favor would be appropriate, even if Schurr had established a prima facie case, which he does not.

■ Whether Resorts' affirmative action plan violates Title VII is determined by application of a two-part test enunciated in *Weber* and refined in *Johnson.* The first question is whether the plan mirrors the purposes of Title VII, that is, whether the plan is justified by the existence of a manifest imbalance in traditionally segregated job categories. *See Johnson,* 480 U.S. at 627–28, 631, 107 S.Ct. 1442. The second question is whether the plan "unnecessarily trammel[s]" the interests of those who are not beneficiaries of the plan or create an absolute bar to their advancement. *See id.* at 630, 637–38, 107 S.Ct. 1442.

### i. "Manifest Imbalance"

■ In order to satisfy the first prong of *Weber,* an affirmative action plan must be remedial and must be justified by the existence of a manifest imbalance in traditionally segregated job categories. *See Johnson,* 480 U.S. at 627–28, 631, 107 S.Ct. 1442; *Taxman,* 91 F.3d at 1564. Schurr argues that Resorts' plan cannot be remedial because there has never been a "finding of discrimination by Resorts or the Commission at the time the minority employment goals were instituted or subsequently revised." Schurr's Memorandum in Support at 14–15. Schurr also argues that there have never been sufficient legislative or administrative findings of a remedial purpose to affirmative action in the casino industry. *See* Schurr's Memorandum in Opposition at 8–9. Schurr also argues that the employment goals were arrived at in a fashion which is not sufficiently nuanced under Title VII. *Id.* at 11–14. These arguments are without merit. Other than these specious arguments, Schurr adduces no facts to suggest that the plan is not in compliance with Title VII.

■ To take the second argument first, Schurr confuses the type of findings which would be required to justify a governmental affirmative action plan in the face of a *constitutional* challenge with the *Weber–Johnson* "manifest imbalance" standard. *See City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493–500, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). In the Title VII context:

> in determining whether an imbalance exists that would justify taking sex or race into account, a comparison of the percentage of minorities or women in the employer's work force with the percentage in the area labor market or general population is appropriate in analyzing jobs that require no special expertise ... or training programs designed to provide expertise ... Where a job requires special training, however, the comparison should be with those in the labor force who possess the relevant qualifications.... A manifest imbalance need not be such that it would support a prima facie case against the employer ... since we do not regard as identical the constraints of Title VII and the Federal Constitution on voluntarily adopted affirmative action plans.

*Johnson,* 480 U.S. at 631–32, 107 S.Ct. 1442; *see also id.* at 633 n. 10, 107 S.Ct. 1442 (distinguishing between skilled and unskilled positions).

As it was required to do under state regulations, the Resorts' plan adopted the goals mandated by section 4.4. The goals set forth in section 4.4 are based upon "the higher of normalized casino industry employment or cumulative Atlantic County work force statistics." *See* 25 N.J. Reg. 3690(a). The Commission in promulgating the goals set forth in section 4.4 continued:

> There are two exceptions to this general rule. First the goals for any particular job category are designed so that they do not exceed the percentage of the cumulative Atlantic County work force statistic for that class (that is, 46 percent for women and 25 percent for minorities). Second, if the Atlantic County availability data for a particular EEOC job category is significantly below (more than 10 percent) the cumulative Atlantic County work force statistic for that class, the employment goal for that particular EEOC category and class will be the Atlantic County availability statistic. The proposed employment goals contained in the amendments to N.J.A.C. 19:53–2.3 and 4.4 are based upon the application of these principles to the 1990 U.S. Census data for the Atlantic County work force and the Commission's

casino industry work force composition analysis. *Id.* By job category, the regulations refer to descriptions of nine categories of workers set forth in N.J.A.C. 19:53–1.3. Each category includes various occupations and skills which would qualify an individual position to be included in the category. For example, the description of "technician," the category into which light and sound technician job fell provided:

"Technicians" are occupations which require a combination of basic scientific or technical knowledge and manual skills which can be obtained through specialized post-secondary school education or through equivalent on-the-job training. Examples include computer programmers and operators, stage and sound technicians and slot mechanics.

N.J.A.C. 19:53–1.3(b)(3). As another example, the category of "laborers" included:

occupations which require the performance of elementary duties which may be learned in a few days and require the application of little or no independent judgment, such as car washers, groundskeepers, and laborers performing lifting, digging, mixing, and loading.

N.J.A.C. 19:53–1.3(b)(8).

There is simply no question that the adoption of employment goals on a category by category basis, distinguishing between varying levels and types of skills required by each category, sufficiently distinguishes between skilled and unskilled workers under *Johnson*. *Johnson* does not require that Resorts distinguish any more, contrary to Schurr's suggestions. Nor is there any question of fact that adopting employment goals predicated upon either specific industry employment levels for each job category or county work force levels for each category satisfies the standard set forth in *Johnson*. Accordingly, I conclude that the employment goals established by section 4.4 are designed to remediate a manifest imbalance in traditionally segregated job categories.

### ii. "Unnecessarily Trammel"

 Resorts' plan does not unnecessarily trammel the rights of men and non-minorities. First, affirmative action efforts are not required at all times and for all job categories. Where Resorts' had surpassed the goals established in N.J.A.C. 19:53–4.4, *i.e.*, where it was not underutilized, special affirmative action goals were not generally mandated by Resorts' plan, and if they were, it was only because Resorts' analysis of employee turnover suggested that job opportunities in these categories were greater than normal. *See, e.g.*, Resorts' Brief in Support, Exh. A at 20, Exh. C. at 3–4.

Second, hiring goals were emphatically considered to be long term goals, rather than hiring quotas. *See, e.g., id.*, Exh. A at 20 (noting that it is impossible "to eliminate underutilization within one year"), Exh. C at 3. Thus, like the plan approved in *Johnson*, Resorts' plan sets asides no specific number of places for women and minorities. *See Johnson*, 480 U.S. at 635, 637–38, 107 S.Ct. 1442. Plus, Resorts' goals are set and amended based on available and reliable data, and in conjunction with an analysis of turnover. *See, e.g.*, Resorts' Brief in Support, Exh. C at 2–3 & Attachment A.

Third, the plan as written reflects the Commission's regulations in that it does not authorize, require, or mandate the use of race as a factor in making hiring decisions. *See, e.g., id.*, Exh. A at 18 (noting that "in the event that an underutilized protected class vacancy is to be filled by a non-female/minority, the EEO/AA Department must be satisfied that all good faith efforts have been made to comply with Resorts' affirmative action plan before authorizing continuation of the hiring process.").

Rather, the central methodologies in the plan revolve around the notion of increasing the number of qualified women and minorities in the applicant pool. *See, e.g., id.*, Exh. A at 22 (increasing utilization of women and minorities in positions with salaries over $35,000 to be accomplished by "creating a network among feeder groups and headhunters who specialize in placement of minority professionals" and "building a 'resume bank' of qualified individuals who can be contacted when vacancies occur"), 23 (focusing efforts at increasing number of female and minority directors and managers on preparing current

employees for internal advancement), 24–26. Thus, instead of excluding qualified men and non-minorities from consideration or presenting an absolute bar to their being hired, Resorts' plan merely requires men and non-minorities to compete against a larger applicant pool.

Indeed, as Resorts' plan was applied by Stevenson, who erroneously took race into account as a factor in making his decision, race was only one *among several* factors which were considered, the most important of which was Boykin and Schurr's qualifications. *See Johnson*, 480 U.S. at 638, 107 S.Ct. 1442 (discussing *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)).

Furthermore, denial of the light and sound technician position to Schurr did not unsettle any legitimate expectation that Schurr would surely be hired. As a member of the Union, which recognized and accepted Resorts' affirmative action policies, *see* Smith's Brief in Support, Exh. F (Exh. 13 at 9), he had to know that qualified women and minority candidates would be recruited and that the job might be posted. Any expectation that Schurr had that he was somehow guaranteed the light and sound position and that no one else would be considered for the position, even after he had been filling in for Maturi on a regular basis, was not a legitimate expectation. Finally, Schurr was in exactly the same position after he was rejected for the light and sound position as he was when he began filling in for Maturi: he was a casual employee who periodically worked for Resorts, among other casinos. Indeed, this is the position in which he remains. Unlike *Taxman*, 91 F.3d at 1564, Resorts' plan does not authorize layoffs or demotions on the basis of race or gender.

In short, Resorts' plan reflect a "moderate, flexible, case-by-case approach to effecting a gradual improvement in the representation of minorities and women" in Resorts' work force. Therefore, I conclude that Resorts' plan does not violate Title VII, and, accordingly, will grant Resorts' motion for summary judgment and deny Schurr's motion for summary judgment.

### 2. Section 1981 Claim

42 U.S.C. § 1981(a) provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). Section 1981 provides a federal remedy against racial discrimination in private employment. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1971). In the Third Circuit, the elements of employment discrimination under Title VII are identical to the elements of a section 1981 claim. *See, e.g., Roebuck v. Drexel Univ.*, 852 F.2d 715, 726 (3d Cir. 1988) (Becker, J.); *Gunby v. Pennsylvania Elec. Co.*, 840 F.2d 1108, 1115 & n. 9 (3d Cir. 1988) (Becker, J.), *cert. denied*, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989); *Lewis v. University of Pittsburgh*, 725 F.2d 910, 915 n. 5 (3d Cir. 1983) (citing, *inter alia, Setser v. Novack Inv. Co.*, 657 F.2d 962, 967 & n. 5 (8th Cir.), *cert. denied*, 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981)), *cert. denied*, 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984); *Harley v. McCoach*, 928 F. Supp. 533, 538 (E.D.Pa. 1996). The same is true in other circuits. *See, e.g., Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1035 (7th Cir. 1998). Accordingly, because Schurr's Title VII claim fails on summary judgment, on summary judgment his section 1981 claim also fails. Therefore, I will grant Resorts' motion for summary judgment on Schurr's 1981 claim and deny Schurr's motion for summary judgment.

### 3. NJLAD Claim

As did the parties in *Taxman*, Resorts and Schurr both agree that analysis of a claim under the NJLAD generally follows the analysis of a Title VII claim. Accordingly, based on the Third Circuit's prediction that the New Jersey Supreme Court would

follow the analytical framework of *Weber* and *Johnson, see Taxman,* 91 F.3d at 1565, I conclude that Schurr's NJLAD claim fails for the same reason that his Title VII claim fails. Accordingly, I will grant Resorts' motion for summary judgment and deny Schurr's motion for summary judgment.

## IV. Conclusion

For the reasons set forth above, Resorts' motion for summary judgment and Smith's motion for summary judgment will be granted. Schurr's motion for summary judgment will be denied.